UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
------------------------------------------------------------------------X
GARY BOREN,

                *Plaintiff*,

-against-

TEXAS CIVIL COMMITMENT OFFICE,
WELLPATH LLC, TEXAS CIVIL COMMITMENT CENTER,
and MANAGEMENT & TRAINING CORPORATION,

                *Defendants*.
------------------------------------------------------------------------X

3:21-cv-1261

**COMPLAINT**

Plaintiff Gary Boren ("Plaintiff" or "Boren"), by his counsel, The Harman Firm, LLP, alleges for his Complaint against Defendants Texas Civil Commitment Office ("TCCO"), Wellpath LLC ("Wellpath"), Texas Civil Commitment Center ("TCCC"), and Management & Training Corporation ("MTC") (collectively, "Defendants"), as follows:

## NATURE OF THE ACTION

1. Under 42 U.S.C. §1981, all persons within the United States have the same right to make and enforce contracts as is enjoyed by white citizens. The term "make and enforce contracts" includes "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). Indeed, as originally enacted and conceived, and still today, race discrimination in the refusal to hire a Black candidate is a violation of the statute.

2. Section 1981 provides for a claim of an individual (whether Black or white) who suffers retaliation because he has tried to help a different individual, suffering racial discrimination, secure his § 1981 rights. *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 452-57 (2008).

1

3. Under 42 U.S.C. § 1981, Plaintiff seeks damages, attorneys' fees and costs from Defendants for terminating his employment in retaliation for complaints of racial discrimination.

4. Plaintiff also seeks damages, attorneys' fees, and costs against Defendants for interfering with his rights under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 *et seq.*, by failing to provide him notice of his right to leave under the FMLA and for retaliating against him for taking leave.

**PARTIES**

5. At all times relevant hereto, Boren was and is a resident of Lubbock County in the State of Texas.

6. Upon information and belief, at all times relevant hereto, TCCO was and is an agency of the State of Texas with its principal place of business at 4616 West Howard LaneBuilding 2, Suite 350 Austin, Texas 78728. Under the Civil Commitment of Sexually Violent Predators Act, TCCO is the state agency responsible for "providing appropriate and necessary treatment and supervision" and "developing and implementing a sex offender treatment program" for committed persons. Tex. Health & Safety Code § 841.007.2.

7. Upon information and belief, Wellpath, formerly known as Correct Care Solutions, LLC, is a healthcare company organized the laws of the State of Tennessee with its headquarters located at 283 Murfreesboro Road Nashville, TN 37217. Wellpath is one of the nation's largest for-profit healthcare providers for prisoners.

8. Upon information and belief, TCCC is an entity created by the partnership between Wellpath and TCCO. TCCC provides sex offender treatment to individuals civilly committed at 2600 S Sunset Ave, Littlefield, TX 79339. In addition to sex offender specific treatment, TCCC

also provides psychological, psychiatric, medical, dental, vocational, recreational, educational and dietary services.

9. Upon information and belief, at all times relevant hereto, MTC was and is a corporation organized under the laws of the State of Utah with its principal place of business at 500 North Marketplace Drive, Centerville, Utah. MTC is a contractor that manages private prisons, including TCCC through a contract with TCCO. MTC operates 24 correctional facilities in 8 states.

## STATEMENT OF FACTS

10. In and around spring 2020, Boren applied for a Human Resources Manager position with MTC.

11. On March 25, Boren supplied Stephanie Hall, HR Corporate Director for MTC, with all requisite forms for his background check.

12. The background check included a TCIC-NCIC Record Request, information needed to schedule TCCC fingerprints and background check in addition to his professional and business references sent to Hall.

13. Upon information and belief, they forms are required by the contract between TCCO and MTC on all pre-employment candidates to have clearance to be hired by TCCC and MTC.

14. On March 26, 2020, Boren was hired by MTC for as the Human Resources Manager for TCCC.

15. Boren's job functions included ensuring that TCCC was in compliance with all relevant anti-discrimination laws, including 42 U.S.C. § 1981 and guidance published by the Equal Employment Opportunity Commission ("EEOC").

16. During the week of August 17, 2020, Boren met with Wayne Schmoker, Assistant Facility Director, and John Cochran, Facility Director.

17. During this meeting, Boren raised issues to Cochran that TCCC's human was resisting the hiring of Steven Scott, a Black retired Lieutenant, for Chief of Security.

18. Scott had had an outstanding 28-year career with Texas Dept of Criminal Justice.

19. TCCC's human resources, however, Mike Searcy; Jessica Marsh, MTC Counsel; and Marsha McLane, Exe Director TTCO, had raised opposition to hiring Scott.

20. This opposition was primarily due to Scott's having old traffic tickets and "hot checks" with his ex-wife.

21. These questions had no bearing on Scott's qualification for the position.

22. Searcy, Marsh, and McLane were simply attempting to frustrate Scott's application because of his race.

23. Searcy, Marsh, and McLane used TCCC's policy regarding background checks to discriminate against Black candidates.

24. For example, if a white candidate and a Black candidate applied both having a speeding ticket 15 years ago, the Black candidate would be subject to much more scrutiny and obstacles to employment

25. Boren told Cochran that he believed Searcy, Marsh, and McLane's conduct violates anti-discrimination laws that protect people of color's ability to obtain employment

26. Boren explained that Searcy, Marsh, and McLane's attempts to discourage candidates with any criminal history from applying and/or reject candidates with any criminal history would disproportionally and negatively impact people of color, primarily, Black and Hispanic people.

27. Boren explicitly stated that, if such a candidate brought a race discrimination claim against MTC and/or TCCC, Boren would have to testify truthfully, specifically, that he knew that MTC and TCCC's practice discriminated against people of color.

28. Boren told Cochran that MTC and TCCC needed to stop the practice.

29. Boren told Cochran that "[he] did not work [his] whole life to come to MTC and throw out what [he] knew was wrongful practices of background investigation by a few rogue individuals, a rogue state agency that had no respect for hiring practices that were the law of the land."

30. Cochran responded that he did not know that this practice was going on.

31. Rather than indicate that he would stop the practice, Cochran told Boren that Cochran would have to "run it up the flag pole to HR Corporate for guidance."

32. TCCC, however, continued to discourage and frustrate Black candidates' applications who had petty violations.

33. For instance, in late April 2020, TCCC refused to hire Waymond Maxwell, who is Black, even after he collected much evidence stating no city or county in Texas was still pursuing punishment of 20-year-old traffic tickets.

34. Boren was not the first employee to recognize TCCC and MTC's policy regarding criminal conviction discriminated against applicants of color.

35. In fall 2019, Hall and Melissa Cox, both agents of MTC's human resources, department had also expressed concerns that TCCC was not following the law and using arrest records to make hiring decisions.

36. On August 24, 2020, Hall sent an email, in which she wrote:

> This meeting is to discuss the ongoing issues with the [TCCC] background checks. Since the transition, Melissa and I have expressed concerns with the

process and now Mr. Boren is also expressing the same concerns. We would like to discuss and identify the best way to proceed.

37. All attendees, Hall, Cox, Boren, TCCC's general counsel, Christina Pignatelli Cochran, 

38. 

39. 

40. 

41. On Wednesday, September 2, 2020, Cochran wanted to discuss the letter to TCCC and directed Pignatelli and Petrogeorge to hold off until Cochran could discuss it with Boren.

42. Cochran excluded Boren from all further discussions despite the fact that Boren is the chief hiring officer and HR manager.

43. On October 5, 2020, a new hire employee who arrived for training off-site informed staff at noon on the first day at a TCCO/MTC required training session that he had been exposed to Covid-19.

44. On October 12, 2020, Boren tested positive for Covid-19.

45. Boren was symptomatic of Covid-19, which caused him to have a serious health condition.

46. Boren could not return to the workplace until he produced two negative Covid-19 tests.

47. Human resources instructed Mr. Boren to refrain from transmitting or responding to any and all work-related communication while he was on leave for Covid-19 via phone during the week of October 12.

48. In a subsequent phone call with Cochran later that same week, Boren suggested that he could work from home, continuing to recruit and set up interviews for prospective employees, however, Cochran instructed Boren to cease all work activity for unspecified reasons.

49. On October 16, 2020, Cochran placed Boren on administrative leave for a policy violation without citing any policy.

50. On December 17, 2020, Cochran fired Boren for an alleged "rule violation.

## CLAIMS

### FIRST CLAIM
### Retaliation in Violation of 42 U.S.C. § 1981

51. Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 50 with the same force as though separately alleged herein.

52. 42 U.S.C. § 1981 prohibits employers from retaliating against an employee for making a complaint of racial discrimination.

53. Plaintiff properly complained to Defendants about race discrimination.

54. Defendants retaliated against Plaintiff by terminating his employment.

55. As a direct and proximate consequence of Defendants' retaliation, Plaintiff has suffered, and continues to suffer, substantial economic and non-economic damages, including, but not limited to, back and front pay, and emotional distress and suffering, all in amounts to be determined at trial.

56. Defendants' retaliatory treatment of Plaintiff Chang was willful, malicious, and in reckless disregard of Plaintiff Chang's protected right to be free from retaliation. Accordingly, Plaintiff Chang seeks an award of punitive damages against Defendants.

57. Plaintiff seeks from Defendants economic damages, emotional distress damages, punitive damages, interest, attorneys' fees, and costs, as well as any other remedies the Court deems proper.

## SECOND CLAIM
### Interference under the FMLA

58. Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 57 with the same force as though separately alleged herein.

59. Under the FMLA, an employee "shall be entitled to a total of 12 workweeks of leave during any 12-month period" in order to "care for …[a] parent [with] a serious health condition." 29 U.S.C. §§ 2612(a)(1), 2612(a)(1)(C).

60. A failure to provide employees with adequate FMLA notice results in an interference claim where the lack of notice caused the employee to forfeit FMLA Leave.

61. Plaintiff was diagnosed with Covid-10, which is a serious health condition.

62. Defendants failed to inform Plaintiff of his right to take FMLA leave and terminated his employment.

63. As a result of Defendants' failures, Plaintiff was prevented from taking FMLA leave.

64. As such, Defendants interfered with Plaintiff's right to FMLA leave and, therefore, violated the FMLA.

65. Defendants willfully and intentionally violated the FMLA by not providing Plaintiff with notice of his right to leave.

66. Defendants did not have a good-faith belief for believing that its conduct did not violate the FMLA.

67. Plaintiff seeks from Defendants equitable relief, economic damages, liquidated damages, punitive damages, interest, attorneys' fees, and costs, as well as any other remedies the Court deems proper.

### THIRD CLAIM
### Retaliation under the FMLA

68. Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 67 with the same force as though separately alleged herein.

69. Under the FMLA, an employee "shall be entitled to a total of 12 workweeks of leave during any 12-month period" in order to "care for …[a] parent [with] a serious health condition." 29 U.S.C. §§ 2612(a)(1), 2612(a)(1)(C).

70. Plaintiff was diagnosed with Covid-19, a serious health condition.

71. Plaintiff was on leave for Covid-19 when Defendant terminated his employment.

72. Defendants' decision to terminate Plaintiff was directly related to his need for leave. Had Plaintiff not asked for and needed leave, he would not have been terminated.

73. Defendants willfully and intentionally violated the FMLA by not terminating Plaintiff for requesting medical leave.

74. Defendants did not have a good-faith belief for believing that its conduct did not violate the FMLA.

75. Plaintiff seeks from Defendants equitable relief, economic damages, liquidated damages, punitive damages, interest, attorneys' fees, and costs, as well as any other remedies the Court deems proper.

## **REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests the following relief:

A. For the first claim, damages, interest, attorneys' fees, and costs to be determined at trial;

B. For the second claim, damages, interest, attorneys' fees, and costs to be determined at trial;

C. For the third claim, equitable relief, damages, interest, attorneys' fees, and costs to be determined at trial;

Dated: Dallas, Texas
June 2, 2021

**THE HARMAN FIRM, LLP**


By: s/ Walker G. Harman, Jr.
Walker G. Harman, Jr. [WH-8044]
*Attorney for Plaintiff*
244 Fifth Ave., Suite H211
New York, NY 10001
(646) 248-2288
wharman@theharmanfirm.com

10